*David R. Faulkner v. State of Maryland*
No. 42, September Term 2019

*Jonathan D. Smith v. State of Maryland*
No. 43, September Term 2019

**Opinion by Biran, J.**

**CRIMINAL LAW — PETITION FOR WRIT OF ACTUAL INNOCENCE — MATERIALITY OF NEWLY DISCOVERED EVIDENCE** — A judge considering a petition for a writ of actual innocence must determine whether newly discovered evidence that could not have been discovered with the exercise of due diligence creates a substantial or significant possibility that a jury, having heard the newly discovered evidence along with the evidence that was actually introduced at the petitioner's trial, would have reached a different result. Md. Code Ann., Crim. Proc. § 8-301(a)(1)(i) (2008, 2018 Repl. Vol.). These companion cases involve: (1) a newly discovered palm print match indicating that alternate perpetrators may have committed the burglary and murder for which Petitioners were convicted; and (2) newly discovered recordings of conversations between a key witness for the State and a Maryland State Police officer showing, among other things, that the State agreed to the witness's demand that the State dismiss unrelated drug charges against the witness's grandson after the witness threatened otherwise to testify favorably for Petitioners in their trials. The Court of Appeals held that, in applying the "substantial or significant possibility" materiality standard in an actual innocence case involving multiple items of newly discovered evidence, a trial judge must conduct a cumulative analysis of such newly discovered evidence. The circuit court in these cases conducted a cumulative analysis of the newly discovered evidence proffered by Petitioners. However, the circuit court abused its discretion by using an incorrect legal standard in its analysis and by failing to correctly assess the materiality of the evidence. Both cases are remanded to the circuit court with instructions to grant the petitions for writs of actual innocence and to order new trials.

Circuit Court for Talbot County
Case No. 20-K-00-006883
Case No. 20-K-00-006884
Arguments: January 7, 2020

IN THE COURT OF APPEALS

OF MARYLAND

Nos. 42 and 43
September Term, 2019

_____

DAVID R. FAULKNER

v.

STATE OF MARYLAND

_____

JONATHAN D. SMITH

v.

STATE OF MARYLAND

_____

McDonald
Watts
Hotten
Getty
Biran
Harrell, Glenn T., Jr. (Senior Judge,
Specially Assigned)
Greene, Clayton, Jr., (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Biran, J.

_____

Filed: April 27, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

On the afternoon of January 5, 1987, Adeline Curry Wilford, 68, was brutally murdered in the kitchen of her home just outside Easton in Talbot County, Maryland. The Maryland State Police ("MSP") officers who arrived on the scene saw that the house had been ransacked. They discovered the palm print of a suspected burglar on the exterior of a propped-up window in the utility room of Ms. Wilford's home, as well as a palm print on the washing machine inside the utility room. MSP theorized that the burglar(s) who left the palm prints murdered Ms. Wilford. MSP was unable to match the palm prints to any person during the initial investigation. The case went cold.

Between 1991 and 1992, a confidential informant told MSP that his friend William Thomas had confessed to him that Thomas burglarized Ms. Wilford's home and stabbed Ms. Wilford to death. The informant further stated that Thomas said his accomplice in the crime was Ty Brooks. MSP learned that both Thomas and Ty Brooks had criminal records involving armed robbery and burglary convictions, respectively, in Talbot County in the 1980s, and that both suspects were at liberty on the day of the Wilford burglary and murder. However, MSP did not attempt to determine in 1991-92 whether the palm prints left at the scene of the crime matched the palm prints of either suspect. The case went cold again.

In January 2000, 13 years after the murder and at the urging of Ms. Wilford's son, MSP reopened the investigation by interviewing Beverly Haddaway. Haddaway told MSP that her nephew, Petitioner Jonathan D. Smith, as well as Petitioner David R. Faulkner and a third young man, Ray Andrews, were involved in the Wilford murder. Although the palm prints at the scene of the crime did not match Smith, Faulkner, or Andrews, and no other physical evidence linked them to the crime, authorities charged Smith, Faulkner, and

Andrews with burglary, murder, and related offenses in the Circuit Court for Talbot County. The charges were based largely on statements made by Smith and Andrews, as well as Haddaway's claim that she saw the three young men walk out of a corn field approximately two-and-a-half to three miles away from the Wilford home on the afternoon of January 5, 1987, and that Smith had blood on his shirt at that time.

Andrews entered into a plea agreement with the State, under which the State agreed to recommend a five-year sentence for involuntary manslaughter. Andrews testified against Smith and Faulkner in separate jury trials in 2001. Haddaway also was a key witness for the State in both trials. In his trial, Smith admitted that he had made self-incriminating statements previously. However, Smith claimed that his prior confessions were false, and that he had admitted involvement in the crime to MSP only after officers threatened him with lethal injection and told him he would never see his family again if he did not confess. In his trial, Faulkner introduced evidence that showed he was paid for having worked on the day of the murder at his job in Centreville, Maryland, but did not produce a time-clock card or other evidence showing definitively that he was at work at the time of the murder.

Both Smith and Faulkner were convicted of burglary and murder, and both were sentenced to life in prison. Smith's and Faulkner's direct appeals and petitions for post-conviction relief proved unsuccessful.

By 2013, Smith and Faulkner both had new sets of attorneys, who moved the circuit court to order the State to run the unidentified palm prints through Maryland's recently created automated print identification system. After an MSP fingerprint expert did so, he discovered that the palm prints left by the suspected burglar belong to Ty Brooks. The State

2

has never theorized, let alone produced any evidence, that Smith, Faulkner, and Andrews worked with Ty Brooks and William Thomas to burglarize Ms. Wilford's home and kill her.

Smith and Faulkner also learned in 2012 that the State had suppressed recorded pretrial conversations between Haddaway and an MSP officer assigned to the Wilford case. Those recordings revealed, among other things, that Haddaway demanded and received the dismissal of drug charges against her grandson in a secret agreement that Haddaway made with law enforcement authorities shortly before she testified against Smith and Faulkner.

Smith and Faulkner filed petitions for writs of actual innocence under Md. Code Ann., Crim. Proc. ("CP") § 8-301 (2008, 2018 Repl. Vol.), contending that, if the newly discovered palm print evidence and pertinent portions of the Haddaway recordings (as well as other purportedly newly discovered evidence) had been provided to their juries, there is a substantial or significant possibility that the juries would have reached different results. The Circuit Court for Talbot County denied relief to both Smith and Faulkner, and the Court of Special Appeals affirmed. For the reasons discussed in this Opinion, we will reverse the denial of Smith's and Faulkner's petitions for writs of actual innocence and order new trials for both Petitioners.[1]

---

[1] Smith and Faulkner separately briefed and argued their appeals of the denial of their actual innocence petitions in the Court of Special Appeals and in this Court. Because the issues in these two cases overlap in almost all respects, we are issuing one opinion addressing both Petitioners' claims.

3

# I

## Background

### A. The Murder of Ms. Wilford

At approximately 3:00 p.m. on the afternoon of January 5, 1987, a neighbor of Adeline Wilford discovered her body in the kitchen of Ms. Wilford's farmhouse off Kingston Road near Easton. Subsequent investigation by MSP revealed that, at 2:10 p.m. that day, Ms. Wilford was photographed at a bank in Easton by the bank's security system, while driving her car through the drive-through lane. Thus, the murder occurred after Ms. Wilford returned home, at some point between 2:10 and 3:00 p.m.

Ms. Wilford's neighbor notified police of the murder, and multiple MSP units responded to the farmhouse, arriving shortly before 3:30 p.m. When the officers arrived, they saw only Ms. Wilford's car parked in the driveway. There was enough space between Ms. Wilford's car and the porch for another car to have parked between Ms. Wilford's car and the house.

When they entered the home, the officers found Ms. Wilford lying face up on the kitchen floor, wearing a blue wool coat. She had a pair of glasses on a cord around her neck. Her keys hung in the lock of the back door leading into the kitchen, and bags of groceries were on the kitchen table. There were numerous stab wounds to Ms. Wilford's hands and face, and a large butcher knife was imbedded in Ms. Wilford's cheek/eye area. There were numerous defensive wounds on Ms. Wilford's hands and arms, suggesting that she had struggled with her killer, attempting to ward off the attack.

4

The police observed that a ground-floor window on the west side of the house was propped open with a stick. Given that it was a cold day in January, officers found the open window noteworthy. The open window led to a utility room containing a washing machine.

It was apparent to the officers that Ms. Wilford's home had been "ransacked"; dressers were opened with "stuff taken out," suggesting that "someone had broken into the house and was looking for money or other goods." Ms. Wilford's tan pocketbook was missing, as was her diamond and sapphire ring and her wallet containing credit cards and an unknown amount of cash. The officers lifted latent fingerprints and palm prints from various places in the home, including the exterior of the utility room window and the washing machine in the utility room.

Based on these observations, MSP theorized that one or more individuals burglarized Ms. Wilford's home on the afternoon of January 5 by entering the utility room through the propped-open window, and were in the process of stealing items when Ms. Wilford returned home. According to this theory, the burglar(s) stabbed Ms. Wilford to death after she entered the home, and left before Ms. Wilford's neighbor arrived.

**B. The Initial Investigation**

Ms. Wilford's murder was the subject of news accounts in the days that followed the crime, and MSP conducted an intensive investigation. Officers determined that Ms. Wilford had recently returned from a vacation and had been back home for a few days prior to January 5, 1987. Police were unable to identify any hard suspects, in large part because they were unable to determine who had left the latent palm prints on the exterior of the utility room window and on the washing machine in the utility room, and because they did

5

not recover any of the stolen items. The Maryland Automated Fingerprint Identification System ("MAFIS") did not exist in 1987. Thus, the only way to match the latent prints at that time was by manually comparing them with prints known to belong to specific people. The palm prints found on the exterior of the utility room window and on the washing machine did not belong to Ms. Wilford or to any other individuals whose prints were checked.

Officers interviewed many people in the days immediately following the Wilford murder, including Danny Keene. Mr. Keene contacted MSP on January 9, 1987, and reported that, on the day of the murder, he observed a silver Oldsmobile Cutlass backed up against Ms. Wilford's home at approximately 2:00 p.m. The car Mr. Keene claimed to have seen next to the house was a different make and model than Ms. Wilford's car that was present when police arrived on the afternoon of the murder.

Despite the offer of a $10,000 reward that was made and publicized within two days of the murder, and that was later increased to $25,000 for information leading to a conviction, the case went cold.

## C. The Investigation of William Thomas and Ty Brooks

An article in the Easton *Star-Democrat* on August 6, 1991, quoted MSP officers as expressing frustration that "[w]e were there within minutes, and still we haven't been able to find anything." This article also mentioned again that there was a $25,000 reward offered by friends and relatives of Ms. Wilford.

On August 7, 1991, James Brooks contacted MSP regarding the Wilford murder. In interviews with MSP in 1991 and 1992, James Brooks said that his friend, William

6

"Boozie" Thomas, had told him that Thomas and Ty Brooks (no relation to James Brooks)[2] burglarized Ms. Wilford's home and that Thomas stabbed Ms. Wilford to death with a butcher knife. James Brooks provided a handwritten statement to MSP in February 1992 in which he described Thomas's confession:

> One summer evening of the year 1990 I was out on a drinking binge. I met up with Boozie Thomas…. [H]e asked me if I knew Adaline [sic] C Woolford [sic] the lady that was murdered in her house… [H]e asked me what did I know about it. I said that from what I heard she knew a little self defense so who ever killed her had to be either real strong or caught her by surprise. [H]e told me he did it and I called him a liar. I laughed for a while then he said that he was going to tell me something and that I was to tell no one for if I did and he found out then he would know that I told so I agreed. [H]e said that him and a guy named Ty Brooks were in her house stealing and the lady came home early on them[.] [H]e had borrowed his sister's car[.] [Ms. Wilford] noticed the car parked near her house and wrote the tag # of the car down before she entered the house. [H]e took a butcher knife I believed hid behind the kitchen door when she came in he stabbed her to death and left her for dead.

James Brooks's information led MSP to add Thomas and Ty Brooks to their list of suspects. MSP learned that both Thomas and Ty Brooks were "under charges, but not incarcerated" on January 5, 1987. MSP also determined that both Thomas and Ty Brooks fit a psychological profile that had been created by MSP of the likely murderer, and that both were physically capable of committing the crime in the manner that James Brooks had described. In addition, MSP's investigation revealed that both Thomas and Ty Brooks "were involved in breaking and enterings during the time period in which [the Wilford] crime occurred," as well as "extreme drug and alcohol abuse during that time." Further, MSP learned that Thomas was convicted of armed robbery in Easton in 1983.

---

[2] For purposes of clarity, we refer to James Brooks and Ty Brooks by their first and last names throughout this Opinion.

7

Police administered a polygraph to James Brooks on February 10, 1992. The administering officers "felt that [James Brooks] might have been more directly involved in the crime" than he had reported. MSP wanted James Brooks to take an additional polygraph, but they were unable to locate him subsequently. The officers believed that "[a]dditional information should be obtained from [James Brooks] prior to any interrogation of [William Thomas and Ty Brooks]." It appears from the record that no such additional information was ever obtained from James Brooks, and that MSP did not attempt to question Thomas or Ty Brooks. Nor did MSP check whether Thomas's or Ty Brooks's palm prints matched the palm prints left by the burglar(s) on the suspected point-of-entry window and the washing machine in the utility room. The case went cold again.

## D. The Reopening of the Investigation and the Arrests of Smith and Faulkner

On December 30, 1999, Ms. Wilford's son, Charles Curry Wilford, spoke with then-Corporal John Bollinger of MSP. According to Bollinger's report, Mr. Wilford was interested in having his mother's case reopened. Mr. Wilford told Bollinger that a retired MSP officer had advised him that "information existed from a potential witness which indicated possible suspects in this case." Bollinger told Mr. Wilford that the investigation would be reopened. Bollinger then contacted the retired officer, and arranged a meeting with the witness, Beverly Haddaway.[3]

---

[3]     Haddaway previously had spoken with police on two occasions about the Wilford murder. In September 1987, she told an Easton police officer that she had information about the murder, but she did not name any suspects. In 1994, after her son Shawn Haddaway was charged with criminal offenses, Haddaway spoke with MSP Trooper Roger Layton and alleged that she saw Smith, Faulkner, and Andrews in the area

That meeting went forward on January 14, 2000. According to the report of that interview, Haddaway told Bollinger that, on the afternoon of the Wilford murder, she was driving with her friend, Thomas Marshall, on Black Dog Alley near Easton. Near the intersection of Black Dog Alley and Kingston Road, Haddaway claimed, she saw her nephew Jonathan Smith, David Faulkner, and Ray Andrews exit a corn field on foot onto Black Dog Alley,[4] at which time she came to a stop. According to Haddaway, she saw that Smith's shirt had blood splatters on it, and he had blood smears on both arms. When she asked Smith where the blood on him had come from, Smith said a dog had tried to bite him and he had killed the dog. According to Haddaway, before she left, she saw a pickup truck approach from the rear. Smith, Faulkner, and Andrews got into the truck, which then drove away. According to Haddaway, she resumed driving on Black Dog Alley, and moments later heard sirens blaring and saw several police vehicles and an ambulance turn onto Kingston Road.

As a result of this interview, police had Haddaway wear a wire and record a conversation between herself and Smith on April 11, 2000. In that conversation, Haddaway brought up the Wilford murder:

---

of the Wilford home on January 5, 1987. It appears from the record that Haddaway's allegations were not investigated between 1994 and 2000.

[4] According to an MSP officer's testimony at trial, Ms. Wilford's home was approximately two-and-a-half to three miles from the intersection of Black Dog Alley and Kingston Road.

Haddaway:     I'm going to ask you something. I want to know you told me once. I'm going to ask you again, cause I heard something in the wind. You know that day I seen you on Kingston Road when that old woman got murdered and you told me the dog bit you and you stabbed it. Who killed the old woman, you? You told me you did.

Smith:     I don't know.

Haddaway:     I think David done it. Why was he wearing your coat?

Smith:     Huh?

Haddaway:     Why did David have on your coat that day?

Smith:     I don't know.

Haddaway:     You're laughing, why did he?

Smith:     I don't know.

              …

Haddaway:     … I just wanted to know before I died. I always think that David done it. You? You said you did. Why are you laughing?

Smith:     I didn't do nothing like that.

Haddaway:     Why were you in that field with blood all over you and no coat? … [Y]ou said that blood come off of a dog, but I think that you held her and David killed her. Or one of you three done it.

Smith:     They never found out yet have they?

Haddaway:     I know that's why I want to know before I die. I seen you, did I ever tell anybody? You know I ain't going to tell, God damn you're my blood. I just wanted to know if you done it. I didn't really think you did. I think crazy David did.

Smith:     They could of, it's a secret when one person knows it ain't a secret when two people know.

10

Haddaway:   Well all three of you know.

Smith:   What, there's only two of us.

Haddaway:   It was you and Ray and David.

Smith:   Ray wasn't there until after it was over.

Haddaway:   Where was he?

Smith:   Down the road.

Haddaway:   Ray was right with you in the God damn field.

Smith:   That was after it was all done with.

….

Haddaway:   … What the hell did you kill her for or did he kill her for?

Smith:   I don't know I can't remember.

Haddaway:   Jonathan you're lying because you're laughing.

Smith:   I can't remember.

Haddaway:   Well why do you think I would tell anybody? I ain't never told nobody in 12 God damn years. I just wanted to know.

Smith:   (inaudible)

Haddaway:   Huh?

Smith:   She had money.

….

Smith:   That was a long time, I don't even remember it no more.

…

11

Haddaway: … I just wondered if [Faulkner] did it or you? Tell me. I ain't going to tell nobody. I just want to know –

Smith: (inaudible) didn't do it.

Haddaway: You done it. You said you did before. Why did you kill her? …

Smith: I knew she had money.

Haddaway: You knew she had money.

Smith: She had money.

Haddaway: But you didn't get none?

Smith: Uh-hum.

Haddaway: You did get it?

Smith: Uh-hum.

Haddaway: Well what the hell did you do with it Jonathan? It must not have been much because you still walk to Cambridge or hitchhiked or went with David.

Smith: You can't spend it all in one pile. It's gone now. Spend a little bit here and a little bit there. You can't spend that much that's how people will talk. I figured it was enough to buy two Ford Explorer's [sic]. (Inaudible).

Haddaway: And you didn't do nothing with it but just pissed it away?

Smith: Uh-huh.

Haddaway: Did they get any?

Smith: Uh-hum we split it three ways.

Haddaway: Three ways. How much did you get?

Smith: (inaudible).

Haddaway: $60,000!

12

Smith:      Uh-hum.

            …

Haddaway:   … What you said that day, what did you tell me, the bitch bit
            me and I stabbed it. You told me a dog, I knew damn well no
            dog blood could get that. But why did David have your coat?

Smith:      He got cut.

Haddaway:   He got cut. So he put your coat on? Didn't he have no coat?

            …

Smith:      Got too much blood on it.

Haddaway:   … How did he get cut?

Smith:      He cut himself.

Haddaway:   He cut his own self?

Smith:      Just about. That's what it looked like. She was asleep.

Haddaway:   She was asleep?

Smith:      Uh-hum. She woke up.

Haddaway:   Well how did he get the knife?

Smith:      Out of the house.

Haddaway:   Well did he cut her?

Smith:      Uh-huh.

Haddaway:   So you both stabbed her?

Smith:      Uh-huh.

            ….

13

Haddaway:     … How did you get there? You told me that day that somebody dropped you off and had to go deliver something and they were coming back.

Smith:        I don't know.

On April 25, 2000, MSP brought Smith, Faulkner, and Andrews in for questioning and to execute search warrants for hair and saliva samples and palm prints. Faulkner made no admissions of involvement in the crime.

According to the report of Andrews's interrogation, Andrews was questioned by Bollinger and another officer on April 25, 2000. The report states that Andrews told the officers that he, Faulkner, and Smith walked from Smith's house in Easton, up Matthewstown Road to a friend's home at Swann Haven Trailer Park. Upon arrival, Smith and Faulkner said something to the friend about "rob or robbing." According to Andrews, the three men left the friend's residence and walked several miles: first down Black Dog Alley, then they turned onto Kingston Road and walked down that road past the Wilford farmhouse down to the bridge over King's Creek. The three then turned around and walked back toward Ms. Wilford's house. Andrews said he waited at the edge of woods off Kingston Road, while Smith and Faulkner walked across a field to the farmhouse. Andrews further stated that he saw Smith and Faulkner go around to the back of the house, then he lost sight of them. Andrews then saw a vehicle pull up the driveway of the residence. Approximately 20 minutes later, according to Andrews, he saw Smith and Faulkner running from the house toward the woods. Once at the woods, Smith and Faulkner told Andrews to run. Andrews saw blood on Smith's shirt. The three made their way back to Black Dog Alley, where they came upon Haddaway. Andrews said he heard Smith tell

14

Haddaway that he had been attacked by a dog. After the conversation with Haddaway, according to Andrews, the three walked back to Matthewstown Road and then to Smith's house in Easton. Andrews said he did not recall if they were picked up on Matthewstown Road by anyone or not. Once at Smith's house, according to Andrews, Smith changed his bloody shirt. Smith and Faulkner then pulled money from their pockets, which Andrews estimated to be approximately $300-$400. Andrews reported that the next day, when news broke of the murder, Smith told Andrews to keep his mouth shut about what had happened.

Smith was questioned by two teams of MSP officers over a period of approximately six to seven hours. Starting at approximately 1:15 p.m, Trooper Jack McCauley and another officer interrogated Smith for approximately two hours. Smith denied any involvement in the Wilford burglary and murder during this round of questioning. Smith then sat in the lockup for several hours. At approximately 6:45 p.m, Bollinger (who, by that time had completed his questioning of Andrews) and another officer began their interrogation of Smith. They attempted to play the recording of Smith's conversation with Haddaway, but Smith was unable to hear it due a serious hearing impairment. According to the two-page report that Bollinger wrote, "[u]pon further questioning," Smith confessed to having broken into Ms. Wilford's home with Faulkner, while Andrews waited outside. Smith reportedly told the officers that Ms. Wilford came home while he and Faulkner were in the house. Smith allegedly told Bollinger that he saw Ms. Wilford "with glasses, black hair and a blue coat at the time of the murder." At that point, according to Bollinger's report, Smith saw Faulkner stab Ms. Wilford several times, and Smith said that Ms. Wilford fell

15

into him during the attack, causing blood to get on his shirt. Neither of Smith's interrogations on April 25, 2000 was recorded.

None of the latent prints of value found at the scene – including the palm prints on the utility room window and washing machine – matched Smith's, Faulkner's, or Andrews's prints. Nevertheless, based on the statements of Haddaway, Andrews, and Smith, the three suspects were charged with burglary, murder, and related offenses.[5] DNA testing done after the filing of charges excluded Smith, Faulkner, and Andrews as sources of DNA that was found in scrapings taken from under Ms. Wilford's fingernails and that came from a source other than Ms. Wilford.

### E. The Trials of Smith and Faulkner

Smith, Faulkner, and Andrews were ordered to stand trial separately. In pretrial discovery, the State produced to Smith's and Faulkner's counsel, among other things, an "Analytical Case Review" prepared by an MSP Criminal Intelligence Division analyst. In a section of the report titled "Chronology of Events," the analyst reported that, on January 9, 1987, Danny Keene contacted MSP and advised "that he observed a silver vehicle parked next to the front porch of the victim's home. He believed the car was an Oldsmobile Cutlass." This summary and a similar report provided to defense counsel did not state that Mr. Keene told MSP that he had seen the Oldsmobile Cutlass at Ms. Wilford's house on the day of the murder, at approximately 2:00 p.m.

---

[5] Smith and Faulkner were arrested on April 25, 2000. Andrews was not arrested until July 2000.

Andrews was scheduled to be tried first, beginning on February 12, 2001. However, on February 13, 2001, Andrews entered an *Alford* plea[6] to involuntary manslaughter under an agreement whereby the State would recommend a five-year jail sentence.

1. Smith's Trial

At Smith's trial, which began on February 27, 2001, the jury heard testimony from the State's fingerprint expert, Alexander Mankevich, that he never matched any of the latent prints found at the crime scene to anyone submitted as a suspect in the case. No physical evidence was introduced that linked Smith (or Faulkner or Andrews) to the crimes. The State's evidence of Smith's guilt consisted of testimony from Andrews, Haddaway, a jailhouse informant named Michael Snow, and Smith's statements to Haddaway and Bollinger.

Andrews generally testified consistently with the account the officers included in their report of his April 25, 2000 interrogation, as discussed above.

Haddaway testified that, on January 5, 1987, she was driving on Black Dog Alley with Susan Fitzhugh,[7] when she saw Smith, Faulkner, and Andrews emerge from a corn

---

[6]     An *Alford* plea – derived from *North Carolina v. Alford*, 400 U.S. 25 (1970) – "lies somewhere between a plea of guilty and a plea of *nolo contendere*." *Bishop v. State,* 417 Md. 1, 19 (2010). In an *Alford* plea, the defendant, "although pleading guilty, continues to deny his or her guilt, but enters the plea to avoid the threat of greater punishment." *Ward v. State,* 83 Md. App. 474, 478 (1990). A defendant entering an *Alford* plea, while maintaining his or her innocence, agrees to a proffer of stipulated evidence or to an agreed statement of facts that provides a factual basis for a finding of guilt. *See Jackson v. State*, 448 Md. 387, 391 n.3 (2016).

[7]     After Haddaway told MSP in January 2000 that her passenger at the time she saw Smith, Faulkner, and Andrews on Black Dog Alley was Thomas Marshall, officers interviewed Mr. Marshall on April 25, 2000. He stated that he was a "horrible alcoholic"

field. According to Haddaway, she noticed Faulkner's glasses were broken, and she saw drops of blood on Smith's shirt. Haddaway testified that Smith told her he had just killed a dog by stabbing it. Haddaway further testified that, when she asked Smith why he was not wearing his coat, he responded that he had given his coat to Faulkner. Because Smith was much taller than Faulkner, Smith's coat came down to Faulkner's kneecaps or just below his kneecaps, and the sleeves of the coat covered Faulkner's hands.

Smith's attorney questioned Haddaway about the reward money she had received for her information, which Haddaway described as a $10,000 deposit toward a total reward of $25,000. Haddaway also admitted that she and Andrews's attorney, Grason Eckel, had visited Andrews together in jail. Defense counsel did not ask Haddaway what she had discussed with Andrews with his lawyer present.

The jury heard the recording of Smith's April 2000 conversation with Haddaway. In addition, McCauley and Bollinger both testified about Smith's statements to them on April 25, 2000. McCauley acknowledged that Smith denied involvement in the Wilford burglary and murder during Smith's first interrogation. Bollinger testified that, after he tried unsuccessfully to get Smith to listen to the recording of Smith's conversation with Haddaway, Bollinger asked Smith "what his involvement was in the case," and Smith then

---

at the time of the Wilford murder, and did not recall being with Haddaway on that date. Haddaway subsequently claimed that she had mistakenly told police that Marshall was with her when she saw the three men on Black Dog Alley, and explained that, after inspecting her records, she recalled that Susan Fitzhugh actually was with her on that day. It is not clear from the record when Haddaway first told MSP that she had been with Susan Fitzhugh, not Marshall. Fitzhugh did not testify at Smith's trial, but did testify at Faulkner's trial several weeks later.

18

told the officers that Faulkner stabbed Ms. Wilford after she interrupted him and Faulkner while they were burglarizing her house. Bollinger testified that Smith told him that, as Ms. Wilford was fighting Faulkner, "Ms. Wilford fell back into him and that he got blood on his shirt." Bollinger further testified that Smith described Ms. Wilford as "wearing a blue coat, had black hair, had glasses on, on a chain around her neck." According to Bollinger, "after this couple of minutes that he talked to me," Bollinger asked Smith if he had ever stabbed Ms. Wilford, at which point Smith asked for an attorney.

Defense counsel elicited from Bollinger that Bollinger had had conversations with Haddaway, but defense counsel did not ask Bollinger about the number of those conversations or about the various subjects Bollinger had discussed with Haddaway.

Michael Snow, a jailhouse informant who was housed in the same facility as Smith, testified that he asked Smith if he "really kill[ed] that woman." According to Snow, Smith looked at him and said "uh-hum," which, Snow told the jury, "sent chills down my back." According to Snow, Smith said that Ms. Wilford "startled [Smith] when she came in. [Smith] said … he was fighting with her trying to get away and then she bit him. He said when she bit him … he went crazy." At the time of his testimony against Smith, Snow was awaiting sentencing on federal bank robbery charges.

Smith testified in his defense. He denied making any incriminating statements to Snow. He acknowledged making inculpatory statements to Haddaway and to Bollinger, but claimed that those earlier statements were not true. With respect to his statements to Bollinger that he made after being at the MSP barrack for several hours, Smith claimed that, after one officer threatened him with lethal injection during the first interrogation and

19

Bollinger told him that he would never see his family again if he did not confess, he told Bollinger: "I did it, David did it. Ray was there." Bollinger and McCauley denied making threatening statements to Smith during their interrogations of him.

The jury convicted Smith of daytime housebreaking and felony murder, and Smith was sentenced to life imprisonment. Smith's direct appeals and post-conviction motions were unsuccessful.

2. Faulkner's Trial

Faulkner's trial began on April 3, 2001. Although Susan Fitzhugh did not testify at Smith's trial, she was an important witness at Faulkner's trial. At the time of the murder, Fitzhugh worked for Haddaway. She testified that she was a passenger in Haddaway's truck proceeding down Black Dog Alley near Kingston Road when she and Haddaway noticed Smith, Faulkner, and Andrews emerging from a corn field. According to Fitzhugh, she saw blood on Andrews's pants, as well as blood on Smith's shirt, pants, and boots, and even more blood on Faulkner than on the other two. Fitzhugh stated that, during their conversation on Black Dog Alley, Smith showed her a hunting knife and said he had killed a deer. Fitzhugh recalled that Smith said he and Faulkner and Andrews were heading back into town to get "Donald" to come back and get the deer they had just killed. According to Fitzhugh, she did not recall seeing anything unusual when she and Haddaway resumed their trip. Fitzhugh further testified that she saw Smith and Faulkner later that same night at Smith's grandmother's house, "fighting and arguing and wrestling" with each other.

At Faulkner's trial, Haddaway added some significant details to her account that she had not provided at Smith's trial. In particular, although Haddaway had not said anything

20

at Smith's trial about seeing blood on Faulkner, at Faulkner's trial she testified that, as she was speaking with Smith from the driver's seat of her truck, she saw blood on Faulkner's pants from his kneecaps "down over his white tennis shoes and all over his tennis shoes," as well as blood smeared on the side of his face. Although Haddaway had not said anything at Smith's trial about seeing Faulkner wearing gloves, but rather testified that the sleeves of the coat Faulkner was wearing had covered his hands, she told Faulkner's jury that she saw Faulkner wearing a pair of black gloves on Black Dog Alley. In addition, Haddaway testified at Faulkner's trial that she saw Smith, Faulkner, and Andrews again that evening at her mother's house, where they were arguing and fighting with each other. Haddaway testified that she also saw money and a piece of jewelry on the dining room table at that time, and she heard Faulkner say that Smith and Andrews were not going to get any money.

Haddaway acknowledged that she had visited Andrews in jail along with Eckel. When Faulkner's counsel attempted to ask Haddaway why she had gone to see Andrews, the State objected, and a long colloquy ensued. The prosecutor stated that she did not "see the relevance in [Haddaway] speaking with a defense attorney for one of the co-defendant's [sic], or visiting with one of the co-defendant's [sic] after his arrest and after the charges had been brought." Defense counsel proffered that, among other things, he wanted to elicit that: (1) Haddaway had gone to visit a "bank robber" with Eckel to try to convince that bank robber to testify against Faulkner; (2) Eckel showed the bank robber pictures that Eckel had received in discovery; and (3) the bank robber refused to testify against Faulkner. The trial judge sustained the State's objection to this line of questioning.

21

Andrews testified again at Faulkner's trial, providing mostly the same account that he testified to at Smith's trial concerning the walk to the Wilford farmhouse and his observations of Smith and Faulkner after they ran back to him. Faulkner's jury also heard Smith's recorded conversation with Haddaway.

A different jailhouse informant, Norman Jacobs, testified that he was housed with Faulkner (and Smith) at the Talbot County Detention Center while Jacobs was awaiting trial on federal drug charges. According to Jacobs, Faulkner repeatedly discussed "his case" with Jacobs, and Faulkner told him that he and Smith had stabbed "the lady" after she entered her house. Jacobs further testified that he heard Faulkner "arguing and cussing" at Smith and "talking about who did the most stabbing." Jacobs also testified that Faulkner told him "the woman bit [Smith] on the finger when he was struggling with the woman." According to Jacobs, Faulkner told him that the reason the State had no evidence linking him to the crime was because Faulkner had worn gloves during the crime. On cross-examination, Jacobs acknowledged that, after providing information about Faulkner to authorities, he reached a plea agreement with federal authorities under which he received leniency.

Faulkner's jury learned from Mr. Mankevich that none of the latent prints of value found at the scene – including the palm prints left by the suspected burglar(s) – matched Smith's, Faulkner's, or Andrews's prints. In addition, unlike Smith's jury, the jury in Faulkner's trial learned that Smith, Faulkner, and Andrews were excluded as sources of

22

DNA that was found in scrapings from under Ms. Wilford's fingernails and that came from a source other than Ms. Wilford.[8]

In his defense, Faulkner introduced records from his place of employment in January 1987, the Tidewater Publishing Corporation, in Centreville, Maryland, which was approximately a 30-minute drive from the Wilford farmhouse. Those records showed that Faulkner was paid for 46 hours of work during the week that included Monday, January 5, 1987. According to the evidence introduced at trial, no timecards were still available for Faulkner from 1987, but other records from Tidewater Publishing showed that, while Faulkner was noted as absent from work on Friday, January 23, 1987, he was not marked as absent on January 5. However, other employees were marked absent on January 5.

The jury returned guilty verdicts against Faulkner for first degree murder and related charges, and he was sentenced to life in prison plus 10 years. His convictions were affirmed on direct appeal. Faulkner unsuccessfully sought post-conviction relief.

## F. Further Investigation and the Petitions for Writs of Actual Innocence

In 2011 and 2012, the New York Innocence Project and the Mid-Atlantic Innocence Project filed Public Information Act requests on behalf of Smith and Faulkner, respectively. MSP subsequently produced several previously undisclosed recorded conversations between Haddaway and Bollinger from February 2 and 8, 2001 (the

---

[8] The State did not disclose information about the DNA test results to Smith's defense counsel prior to Smith's trial, although the MSP crime lab had furnished the State's Attorney's Office with that information in advance of Smith's trial. Smith sought post-conviction relief due to the failure of the State to disclose this exculpatory evidence to him. Surprisingly, Smith's post-conviction counsel abandoned that claim when he had his post-conviction hearing.

"Haddaway-Bollinger recordings"), in which, among other things, Haddaway threatened to testify favorably for the defendants at their upcoming trials unless the State dismissed unrelated drug charges against her grandson, Landon ("Lonnie") Janda. The State, in fact, dismissed the charges against Janda on February 9, 2001, three days before Andrews's trial was scheduled to begin. On August 1, 2013, both Smith and Faulkner filed motions to reopen their post-conviction proceedings based on the Haddaway-Bollinger recordings.

Meanwhile, by 2013, MAFIS provided MSP with the ability to perform electronic palm print searches. In August 2013, Smith and Faulkner filed a motion for post-conviction comparison of latent prints, requesting that the circuit court order the State to enter the unidentified latent palm prints from the crime scene into MAFIS to determine whether an unknown suspect could be identified. Although the State initially opposed this motion, in October 2013, the State, prior to a ruling by the court, contacted Mr. Mankevich and asked him to run the palm prints from the Wilford crime scene in MAFIS. Mr. Mankevich retrieved the lift cards from the Hall of Records and personally entered them into MAFIS. After receiving the computer-generated list of potential matches, Mr. Mankevich compared Ty Brooks's known palm prints to the palm print taken from Ms. Wilford's washing machine and the palm print taken from the exterior of the utility room window. Mr. Mankevich concluded that Ty Brooks was the source of both those prints.

In June 2015 and July 2015, respectively, Smith and Faulkner filed petitions for writs of actual innocence, based on three distinct items of allegedly newly discovered evidence: (1) the identification of Ty Brooks as the source of the palm prints; (2) the Haddaway-Bollinger recordings; and (3) statements by Danny Keene that he saw an

24

Oldsmobile Cutlass at Ms. Wilford's house at approximately 2:00 pm on the day of the murder.

## II

## The Hearings and Appeals Below

### A. The 2016 Evidentiary Hearing

Smith's and Faulkner's motions to reopen post-conviction proceedings and their actual innocence petitions were consolidated for an evidentiary hearing that went forward over seven days in April 2016 in the Circuit Court for Talbot County before the Honorable Stephen H. Kehoe.[9]

#### 1. The Palm Prints and Related Evidence

Mr. Mankevich explained at the hearing how he determined that the palm prints on the exterior of the utility room window and on the washing machine in the utility room belonged to Ty Brooks. Mr. Mankevich also testified that he excluded Ty Brooks as the source of prints found in other places in the Wilford house. Mr. Mankevich further explained that there is no reliable forensic technique that can indicate how long a print has been on a surface prior to collection. Mr. Mankevich also testified that he eliminated William Thomas as the source of seven of the eight remaining unidentified latent print impressions, but was unable to perform a full comparison of the eighth print, which was taken from the porch door.

---

[9] The Honorable William S. Horne, who presided over Smith's and Faulkner's trials, and who ruled on their original post-conviction motions, had retired by the time of the hearings on the actual innocence petitions and motions to reopen post-conviction proceedings.

James Brooks also testified at the hearing. He stated that he was a longtime friend of William Thomas. James Brooks explained that he contacted MSP at some point around 1991 about the Wilford murder. It was established that James Brooks was listed in MSP's records as a confidential informant.

Although James Brooks's memory had faded somewhat by the time of the 2016 hearing, he recalled that, while traveling in a car with Thomas within a few years of the murder, Thomas told him that he (Thomas) had stabbed Ms. Wilford in her home during a burglary. James Brooks acknowledged that, when he first reported Thomas's confession to police, he was "strung out on drugs" and "trying to cash in on the reward." James Brooks testified that Thomas told him he was with someone else when he committed the robbery and stabbed Ms. Wilford. The circuit court allowed Smith and Faulkner to admit James Brooks's written statement from 1992 into evidence, although the court required that Ty Brooks's name be redacted from that statement for hearsay reasons. As discussed above, in that written statement, James Brooks reported that Thomas had confessed to killing Ms. Wilford with a butcher knife after she interrupted the burglary.

James Brooks testified at the 2016 hearing that he knows Ty Brooks and grew up with him. He also explained that Thomas and Ty Brooks knew each other in 1987; they were brothers-in-law at that time.

James Brooks recalled that Thomas said he had borrowed the car he and Ty Brooks used to get to Ms. Wilford's house from his uncle. Similar to his written statement from years earlier, James Brooks recalled Thomas mentioning that Ms. Wilford "might have wrote down the tag number I think of the car it was." When asked if he could recall if

26

Thomas said where he had stabbed Ms. Wilford, James Brooks testified, "it might have been in the back." James Brooks recalled that Thomas instructed him to tell nobody what Thomas had told him about the Wilford murder. This was the first and only time anyone has ever told James Brooks about committing a murder.

MSP Sergeant Sabrina Metzger testified that Ty Brooks and Thomas were both at liberty on the day of the Wilford murder. Thomas had just been released from incarceration in December 1986. Metzger testified that, in the course of its investigation, MSP found no connection between Smith and Faulkner and either Thomas or Ty Brooks.

Smith and Faulkner called Thomas as a witness at the hearing. He invoked his Fifth Amendment right against self-incrimination.

The circuit court heard an audio tape of a hearing in which Ty Brooks entered a guilty plea on May 21, 1987, to various charges unrelated to the Wilford burglary and murder. The charges to which Ty Brooks pled guilty included burglary, theft, and battery, among others, based on acts that Ty Brooks committed in Easton in October 1986, February 1987, and March 1987. The statement of facts by the prosecutor indicated that Ty Brooks was in an Oldsmobile when he was arrested in March 1987, and that he broke into some of the places he stole from by entering windows.

2. The Haddaway-Bollinger Recordings

At the hearing, Smith and Faulkner established that, in the 13 months between the time Bollinger first met with Haddaway in January 2000 and Andrews's scheduled trial in

27

February 2001, Bollinger and Haddaway spoke several hundred times.[10] At some point, Bollinger began recording some of those conversations without Haddaway's knowledge. Of particular relevance here are recordings Bollinger made of his conversations with Haddaway on February 2, 2001, and February 8, 2001. As of February 8, Andrews's trial was still scheduled to begin on February 12.

During a recorded telephone conversation on February 2, 2001, Bollinger and Haddaway discussed a request Haddaway had previously made that the State dismiss unrelated drug charges against her grandson:

Haddaway: I thoght you were going to call me when you talked to asshole.

Bollinger: Well, I was only going to call you if I had good news.

Haddaway: Oh, so I guess [Assistant State's Attorney Marie Hill[11]] ain't going to do nothing.

Bollinger: Nope.

Haddaway: Well.

Bollinger: No, I asked her, I asked [Assistant State's Attorney John Mark McDonald[12]] and they are not, not willing or not going to drop the charges against him right now.

Haddaway: Well, too bad. I wish him luck. That just gives me this weekend to knock them all out. Don't it?

---

[10]    Bollinger testified at the 2016 actual innocence hearing. By the time of that hearing, Haddaway was deceased.

[11]    Assistant State's Attorney Hill was the prosecutor in the Wilford case.

[12]    Assistant State's Attorney McDonald was the prosecutor in Landon Janda's drug case.

Later in the same conversation, after Bollinger asked if Haddaway was still "going to come and tell the truth," Haddaway replied: "I'm going to come in and tell the truth but I don't think the truth is going to want to be known. I really don't and I got more shit to back up the truth than a little speck. You know?" Bollinger tried to mollify Haddaway by saying that he could ask Janda's prosecutor again to dismiss the drug charges after the Andrews trial was over. Haddaway responded:

> Well, it won't be no need to ask after the trial's over because Grason's going to win hands down. They'll be doubt in everybody on the jurors' mind and I'm the one that's going to roll the iceberg right down there and watch that son of a bitch hit everybody in that fucking Courtroom. Do you think I'm kidding, John? I'm not. You can go get the newspaper to start printing: Three People Found Innocent and I've got just one little piece of paper and it can all be had with one word that nobody knows but I know and I got the paper and I got the proof and one word, just one word out of the English language will let all three of them walk and for my grandson, you don't think I'll use that fucking word?.... I will use it and watch all three of them walk, walk, walk, walk, and say, hey now we're going to sue the fucking state because it ain't no sense of suing me, I ain't got nothing.

Haddaway said she might give the "one word" "to Grason today so that he has plenty of time to use it." Haddaway claimed she could deploy this word to ensure

> freedom for three boys and I absolute can guarantee a hundred percent… Now, I'm ain't going to help Marie Hill no more. Marie Hill can get John McDonald to be her … witness because I absolutely won't. I've got two choices. I'll take the Fifth Amendment and that wouldn't set 'em free but what I can do, can set them free and I'm going to bring it and show it to you and then you think about if you think this old bitch ain't slick because I am. I am.

Later that same day, Haddaway and Bollinger met in person, and Bollinger recorded that conversation as well. Haddaway again threatened to testify in a way that would lead to acquittals for Smith, Faulkner, and Andrews, and that would disqualify her from

receiving the additional reward money. Haddaway told Bollinger that the "word" she was referring to was "crazy," and threatened to reveal to the jury that she had been diagnosed with "an extensive emotional and psychological problem." Bollinger told Haddaway that he would speak with Talbot County State's Attorney Scott Patterson to try to go "over [McDonald's] head" and get Janda's drug charges dismissed.

Bollinger also showed Haddaway a description or drawing of a ring and provided her with other information material to the Wilford case. The recordings also reveal that Bollinger was aware that Eckel had shown Haddaway evidence that he had received in discovery from the State in preparation for Andrews's trial. Although Bollinger acknowledged to Haddaway that Eckel "probably shouldn't have given" Haddaway evidence that he had received in discovery because Haddaway was "the main State witness," Bollinger nevertheless indicated his awareness and approval of Eckel's continued sharing of discovery material with Haddaway.

In a telephone conversation on February 8, 2001, Haddaway and Bollinger discussed how, the previous day, Bollinger had told Haddaway that Janda's drug charges would be dismissed. Based on that conversation, Haddaway was expecting to receive written confirmation on February 8 that Janda's charges had been or would be dismissed. However, when Eckel (who was also representing Janda in his drug case) attempted to pick up a letter from Hill relating to the dismissal of Janda's drug charges, Hill told Eckel that she knew nothing about any such letter. Eckel reported this to Haddaway, which led Haddaway during the February 8 conversation with Bollinger to complain that Bollinger had lied to her when he said that written confirmation of the dismissal of Janda's charges

30

would come from the State's Attorney's Office. Bollinger replied that he "didn't say it was going to be in writing. I said they were going to notify [Eckel] today. I specifically told you that it would not be in writing that the … case would be nolle prossed and they would never be brought back. That was made clear to me that it would never be put in writing that way."

Later in the conversation, Bollinger again said that Patterson was going to have the case against Janda dismissed. When Haddaway remarked that she only had Bollinger's "word on this," Bollinger responded that "we did good for you, but we also protected ourselves." Haddaway continued:

> What did you just say? We're protecting ourselves. What do you think I want the fucking paper for? Because if it was just you and Jack,[13] I'd probably would go up there, like a dumb little lamb to the slaughter. Thinking yes, if I go up here maybe once in, in the world, the fucking law will work the way it should. But you know, I've had too many episodes of being the little lamb that wanted to help out somebody, and get my fucking ass killed. But this time, I'm not going to be the lamb chop. When I go in there, either Sissy[14] and Lonnie will be satisfied or you'll know they're not satisfied. How stupid is that? That's protecting my ass, ain't it? But you all wanna play games. "Well, Beverly, you go ahead and help them, you do everything you can. Beverly, you go ahead and do this, and we'll go ahead and do that." But all you have is air and there's nothing concrete and no paperwork.

Bollinger reiterated that "protecting … our interest, is all we're doing. We have three murder trials coming up." Bollinger also explained that the State's Attorney's Office felt that Haddaway was "trying to blackmail 'em with, with your grandson's charges, in order

---

[13]    It appears that Haddaway here was referring to Trooper McCauley.

[14]    Sissy is the nickname of Laci Janda, Haddaway's daughter and Lonnie Janda's mother.

31

to testify." Haddaway tried yet again to convince Bollinger to get the "paper" she was seeking from the State's Attorney's Office:

> I want your ass to go up there… They're making you a promise. Put the motherfucker on the paper. Because you know what John, this is what you don't understand. If they show me a piece of paper that says this is their word and I know this is the word, I'll go in that fucking courtroom and I'll testify and they'll be happy. Because this piece of word that they've given me is my insurance policy that the whole fucking whole bunch of lying cocksuckers ain't lying…They're going to give Grason Eckel something to say they're nolle processing Lonnie. Ain't hard to do.

Haddaway continued: "I want that motherfucker to say that Landon Janda will not be prosecuted on any and all charges. I also want them to know that after the first trial they are going to immediately hand me a paper before I testify in the second and third that says that he has total immunity." Haddaway made clear that she wanted assurance that the charges against Janda would not be revived after the third murder trial.

In the same conversation, Haddaway commented that "they gotta go to the jail and scrape the bottom of the bucket to find out if they can get somebody that's got six months' time a way out to see if he'll lie for 'em. And then they gotta go up to jail and try to get a federal prisoner or a [sic] undercover cop to try to lie for them, who's not interested in it. Who told us that he happened to be a federal prisoner and he don't give a fuck." Bollinger responded, "Who's us? Told who?" Haddaway answered: "Wonder. I don't have any papers on it. I just have to go by memory."

On February 9, 2001, the State dismissed Janda's drug charges.

### 3. Danny Keene's Information

As noted above, prior to the trials, the State gave Smith's and Faulkner's counsel discovery material in which it was reported, among many other things, that on January 9, 1987, Danny Keene contacted MSP and advised an officer that he had seen a silver vehicle that he believed to be an Oldsmobile Cutlass parked near Ms. Wilford's home. However, those documents did not state when Mr. Keene had observed the Oldsmobile outside Ms. Wilford's house. At the hearing on the actual innocence petitions, Smith and Faulkner called Mr. Keene as a witness. He testified that he saw an Oldsmobile Cutlass backed up against Ms. Wilford's porch shortly before 2:00 p.m. on the day of the murder.

Specifically, Mr. Keene explained that, in January 1987, he was working as the head guide of a company that took "city people" out on hunting parties in Talbot County. Mr. Keene's company rented a farm next to Ms. Wilford's house that they used during hunting season. Mr. Keene often drove by Ms. Wilford's home, but he did not know Ms. Wilford. Mr. Keene described driving past the Wilford house three times on January 5, 1987. At approximately 10:00 a.m., after leading a hunting party on the adjacent farm that morning, Mr. Keene drove back to Easton via Kingston Road. He was taking the geese the hunting party had caught to a "picker," who would remove the feathers from the birds. He had to drive past the Wilford farmhouse on Kingston Road as part of that trip to Easton. Mr. Keene did not notice a car on the Wilford property at that time.

Later that day, Mr. Keene drove back from Easton to the farm next to the Wilford property. He was meeting a co-worker at 2:00 p.m. to set up a "water blind" for the next

33

day's hunting party. On his way back to the neighboring farm, at approximately 1:50-1:55 p.m., Mr. Keene passed the Wilford farmhouse again. It was sunny, and he looked at Ms. Wilford's property for geese. After noticing some clothes hanging on a line outside the house,[15] Mr. Keene saw a car that he believed to be a "jacked up" Oldsmobile Cutlass Supreme with chrome wheels, whitewall tires, and a split grill "[b]acked up against" Ms. Wilford's house. The car was parked "very close to the house." When shown a photograph of Ms. Wilford's car (not an Oldsmobile Cutlass) in the driveway of the property after the murder, Mr. Keene stated that the car he had seen on the property that day was a different car and had been parked in a different direction.

After setting up the water blind, Mr. Keene left the neighboring farm and drove back toward the Wilford property a third time. As he approached Ms. Wilford's house, he saw many police cars there.

### 4. The Circuit Court's 2016 Ruling and the First Appeal to the Court of Special Appeals

On June 21, 2016, the circuit court denied Smith's and Faulkner's actual innocence petitions.[16] The court concluded that the proffered newly discovered evidence did not prove Smith and Faulkner to be innocent. However, believing that it nevertheless had the discretion to grant new trials to Smith and Faulkner, the court considered whether the Ty

---

[15]    Photographs taken by police of the exterior of Ms. Wilford's home and the surrounding yard and fields on the afternoon of January 5, 1987, show clothes hanging on a line near the house.

[16]    The circuit court issued separate written opinions denying Smith's and Faulkner's petitions. Because the hearings on the petitions had been consolidated, the two opinions were largely duplicative of each other.

Brooks palm print match, the Haddaway-Bollinger recordings, and the Keene information could have been discovered before the deadline set forth in CP § 8-301(a)(2), i.e., within the time for filing a motion for a new trial under Maryland Rule 4-331. The court concluded that Smith and Faulkner could have discovered all the proffered evidence in time to file for new trials under Rule 4-331. Thus, the court denied the petitions for writs of actual innocence. The court also denied Smith's and Faulkner's motions to reopen their post-conviction proceedings.

On appeal, the Court of Special Appeals reversed, observing that, "although CP § 8-301 applies only to newly discovered evidence that 'speaks to' actual innocence, the petitioner need not definitively prove his or her innocence to warrant relief under the statute." *Smith v. State*, 233 Md. App. 372, 413 (2017).[17] The court held that the Ty Brooks palm print match, the Haddaway-Bollinger recordings, and the Keene evidence all "speak to" Smith's and Faulkner's innocence. *Id.* at 414-15; *Faulkner*, 2017 WL 3167104, at *6.

The intermediate appellate court further held that the circuit court did not abuse its discretion in concluding that the date and time of Mr. Keene's observation of a car next to Ms. Wilford's home could have been discovered with due diligence. *Smith,* 233 Md. at 418. However, the Court of Special Appeals concluded that the circuit court's similar ruling regarding the Ty Brooks palm print evidence and the Haddaway-Bollinger recordings was an abuse of discretion, finding that those newly discovered pieces of evidence could not

---

[17] The Court of Special Appeals issued an unpublished opinion in Faulkner's appeal incorporating its analysis in *Smith. Faulkner v. State*, Nos. 1066 & 1878, Sept. Term 2016, 2017 WL 3167104 (Md. Ct. Spec. App. Jul. 26, 2017).

have been discovered with due diligence in time to move for new trials under Rule 4-331. *Id.* at 419-30. Concluding that the circuit court had not considered whether the palm print match and the Haddaway-Bollinger recordings, if provided to Smith's and Faulkner's juries, would have created a substantial or significant possibility of a different result in their trials, the Court of Special Appeals remanded the innocence petitions to the circuit court to consider that question. *Id.* at 432-33; *Faulkner*, 2017 WL 3167104, at *8. The court also ordered the circuit court to reopen Smith's and Faulkner's motions for post-conviction relief. *Smith*, 233 Md. App. at 437-39; *Faulkner*, 2017 WL 3167104, at *8.

### 5.   The Circuit Court's Ruling on Remand and the Second Appeal

On remand, the circuit court held another three-day hearing in January 2018, again considering Smith's and Faulkner's claims in the same proceeding.[18] Mr. Mankevich testified again at this hearing, and made clear that there was no way to determine when Ty Brooks left his palm prints at the crime scene.

Ty Brooks was called to testify at this hearing. He asserted his Fifth Amendment right against self-incrimination. In addition, Sgt. Metzger testified again, this time providing details about an interview she conducted of Ty Brooks on February 19, 2015. In that interview, Ty Brooks denied having been to Ms. Wilford's house and breaking into it. Although he denied having burglarized Ms. Wilford's house, Ty Brooks acknowledged that he had committed multiple burglaries in Easton around the time of the Wilford burglary and murder; indeed, he described having "terrorized Easton." Ty Brooks referred

---

[18]     The court issued separate written opinions that again were substantially duplicative of each other.

36

to William Thomas as "Boozie." While Ty Brooks at first denied having committed crimes with Thomas, upon further reflection, he said he thought they had taken "something off the junkyard" together.

Regarding the Haddaway-Bollinger recordings, the circuit court held that they were not sufficiently impeaching to meet the substantial possibility standard. In the court's view, "[t]hese exchanges appear to be little more than bluster by Ms. Haddaway in an attempt to put more pressure on the State into *nolle prossing* the charges against her grandson. They do not indicate that she would contradict any evidence or change her story on the core question of guilt or innocence. Instead she threatened to make herself seem less credible, not to make the story that she had to tell less credible. This exchange does not contradict any of her testimony nor any other facts adduced at trial." The circuit court also found significant that Bollinger did not "appear to be intimidated or overwhelmed by" Haddaway. The court concluded that the Haddaway-Bollinger recordings "do not merit the granting of a new trial because they do not cause the jury to disbelieve the core of Ms. Haddaway's testimony."

Given the undisputed palm print match showing that Ty Brooks is the source of the prints found on the utility room window and on the washing machine in the utility room, the court found that Ty Brooks's statement to Sgt. Metzger claiming that he had never been to Ms. Wilford's home was false.

The circuit court then analyzed James Brooks's written statement to MSP in 1992 and his testimony from the first actual innocence hearing in 2016. The court credited that Thomas told James Brooks he was involved in the burglary and murder, and that Thomas

37

admitted to having grabbed a butcher knife. However, the court focused on other details in James Brooks's written statement and testimony that the court found problematic. With respect to the written statement, the court focused on the part of Thomas's confession in which Thomas said that he and Ty Brooks had driven to the Wilford home, and that Ms. Wilford had noticed the car parked near her house and written the tag number of the car down before she entered the house. Based on the fact that Ms. Wilford brought her groceries into the house, the court found it impossible that a strange car was at the Wilford home when Ms. Wilford returned:

> For Mrs. Wilford to have entered her house with her groceries and placed them on the kitchen table is, to say the very least, an unusual step for someone who was so alerted that there might be [a] prowler inside her house that she wrote down the license plate number of the strange car parked near her house. The Court finds that there is no credibility whatsoever to the suggestion that Mrs. Wilford, who was so concerned about the presence of a stranger's car parked in her driveway that she wrote down the tag number of the car, took her groceries out of her car, entered her house and placed the groceries on the kitchen table. In other words, the fact that Mrs. Wilford entered her house with her groceries and placed them on the table indicates that she could not have been aware that a stranger was in her house.

The court also took note of the end of James Brooks's written statement, where he wrote, referring to Thomas: "[H]e took a butcher knife I believed hid behind the kitchen door when she came in he stabbed her to death and left her for dead." The court stated that this recounting of Thomas's confession, as well as James Brooks's testimony at the hearing that Thomas might have told him that he stabbed Ms. Wilford in the back, was at odds with the forensic evidence, which indicated that Ms. Wilford died in a struggle and was not stabbed in the back. Further, the court interpreted the word "believed" in the written

38

statement to mean that James Brooks was "no longer reciting things that Mr. Thomas putatively told him," but rather was "stating his own belief as to how the murder occurred."

The court summarized the counter-narratives that it believed Smith and Faulkner could have presented to their juries using the newly discovered evidence. The court then summarized the evidence of Smith's and Faulkner's guilt that was presented at their trials, concluding that it provided "a fairly consistent narrative that Mr. Faulkner, Mr. Smith, and Mr. Andrews set out to rob Mrs. Wilford's home on January 5, 1987; during the course of the robbery Mrs. Wilford came home from doing her errands, and … she was killed."

As it began the final portion of its opinions, the court framed the ultimate question as whether Smith's and Faulkner's counter-narratives "would have generated a reasonable doubt in the jury's mind." The court then quoted the reasonable doubt instructions the trial judge had provided to the juries, including the description of proof beyond a reasonable doubt as "such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such a belief without reservation in an important matter in your own business or personal affairs."

The court opined that the "principal strength" of Smith's and Faulkner's counter-narratives "is that Ty Brooks was clearly at Mrs. Wilford's house." On the other hand, the "weakness in [the] counter-narrative[s] is that [they] hinge[] on the implausible notion that Mrs. Wilford would have entered her house with her groceries and placed them on her kitchen table despite knowing that a prowler was in her house by way of a stranger's car parked in her driveway."

39

The court concluded: "The proposition that Mrs. Wilford came into her home with her groceries despite the evident presence of a prowler is so incredible that the Court finds that there is no substantial or significant … possibility that a reasonable juror would have acted on that proposition without reservation in an important matter in his or her own business or personal affairs." The court therefore denied Smith's and Faulkner's actual innocence petitions. However, the court ruled that Smith and Faulkner could proceed in their post-conviction proceedings to determine whether "there have been constitutional violations that have not yet been addressed."

Smith and Faulkner once again appealed. The Court of Special Appeals affirmed the denial of Smith's and Faulkner's innocence petitions in unreported opinions. The court found no abuse of discretion in the circuit court's discounting of the Haddaway-Bollinger recordings, given the other evidence of guilt, and given that Haddaway's credibility was already in question at both trials. Although the intermediate appellate court recognized that Haddaway was a "key witness" for the State, the court held that the circuit court "properly recognized that her testimony was cumulative to the testimony" of other witnesses. The Court of Special Appeals also discerned no abuse of discretion in the circuit court's assessment of the palm print match and related evidence.

Smith and Faulkner both filed petitions for *certiorari* in this Court seeking review of the circuit court's rulings denying their actual innocence petitions. On September 9, 2019, we granted both petitions.

## III

## Discussion

To prevail in their actual innocence petitions, Smith and Faulkner must produce newly discovered evidence that: (1) "speaks to" their actual innocence; (2) could not have been discovered in time to move for a new trial under Rule 4-331; and (3) creates a "substantial or significant possibility" that, if their juries had received such evidence, the results of their trials may have been different. *Smith,* 233 Md. App. at 422; CP § 8-301. The first requirement ensures that relief under § 8-301 is limited to a petitioner who makes a threshold showing that he or she may be actually innocent, "meaning he or she did not commit the crime." *Smallwood v. State*, 451 Md. 290, 323 (2017). The second requirement ensures that petitioners exercise diligence to locate evidence of innocence. A petitioner need not "exhaust every lead or seek to discover a needle in a haystack." *Smith*, 233 Md. App. at 415. However, a petitioner must show that he or she could not have located the newly discovered evidence with the exercise of "due diligence" by the deadline to file a motion for a new trial under Rule 4-331. *See id.* at 416. The final prong requires the petitioner to show that, if the jury had had the benefit of the newly discovered evidence as well as the evidence that was introduced at the trial, there is a "substantial or significant possibility that the result would have been different." *Yonga v. State*, 221 Md. App. 45, 69 (2015). The substantial or significant possibility standard falls between "probable," which is less demanding than "beyond a reasonable doubt," and "might," which is less stringent than "probable." *McGhie v. State*, 449 Md. 494, 510 (2016).

41

## A. Standard of Review

A trial court's ruling on a petition for writ of actual innocence is reviewed under an abuse-of-discretion standard. *State v. Hunt*, 443 Md. 238, 247-48 (2015). We accept the circuit court's factual findings unless clearly erroneous. *Yonga*, 221 Md. App. at 95. We do not reverse a trial court's discretionary determination unless it is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *King v. State*, 407 Md. 682, 697 (2009) (internal quotation marks and citations omitted).

A trial court must exercise its discretion in accordance with correct legal standards. *Jackson v. Sollie*, 449 Md. 165, 196 (2016). Where a trial court fails to do so, it abuses its discretion. *See, e.g., Wilson-X v. Department of Human Res.*, 403 Md. 667, 675 (2008) ("[T]rial judges do not have discretion to apply inappropriate legal standards, even when making decisions that are regarded as discretionary in nature."); *Matter of Dory*, 244 Md. App. 177, 203 (2019) (explaining that "a trial court's discretion is always tempered by the requirement that the court correctly apply the law applicable to the case. Indeed, trial courts do not have discretion to apply incorrect legal standards and a failure to consider the proper legal standard in reaching a decision constitutes an abuse of discretion.") (cleaned up).

## B. New Trials Are Warranted.

We commend the circuit court for the thorough hearings it conducted in 2016 and 2018 in these cases. However, after careful review, we conclude that the court abused its discretion when it denied relief to Smith and Faulkner following the 2018 hearing.

### 1. The Keene Evidence

In its 2017 rulings, the Court of Special Appeals held that Smith and Faulkner failed to show that they exercised due diligence in learning the date and time that, according to Mr. Keene, he saw an Oldsmobile Cutlass backed up against Ms. Wilford's home. Thus, the intermediate appellate court directed the circuit court, on remand, not to consider the Keene evidence in assessing the petitions for actual innocence. Faulkner appeals the ruling that the Keene evidence could have been discovered with the exercise of due diligence. This is a close question that we need not decide.[19] As discussed below, relief is warranted without consideration of Mr. Keene's information.[20]

### 2. The Palm Print Match and the Haddaway-Bollinger Recordings

Smith and Faulkner argue that the circuit court abused its discretion in several respects in its consideration of the Ty Brooks palm print match and the Haddaway-

---

[19]    Nothing in the record suggests that the State intentionally suppressed the date and time of Mr. Keene's alleged sighting of the Oldsmobile from Smith's and Faulkner's trial counsel. However, given the State's theory of the case, which was that Smith, Faulkner, and Andrews walked to Ms. Wilford's home and ran back to Black Dog Alley after the murder, the fact that Mr. Keene told MSP that he saw an Oldsmobile Cutlass backed up against Ms. Wilford's home close to 2:00 p.m. on the day of the murder was *Brady* material and, therefore, the State had an affirmative duty to disclose those details to Smith and Faulkner (and to Andrews) after they were charged. *See State v. Williams*, 392 Md. 194, 227 (2006) ("A defendant's duty to investigate simply does not relieve the State of its duty to disclose exculpatory evidence under *Brady* and Maryland Rule 4–263(g).").

[20]    Unlike Faulkner, Smith did not include a question in his petition for *certiorari* concerning the Keene evidence. In his opening brief, Smith states that he incorporates by reference Faulkner's argument that the lower courts erred in their holdings regarding the Keene evidence. The State objects to Smith's incorporation by reference of Faulkner's argument about the Keene evidence. Given our disposition of these appeals, we need not decide whether it would be appropriate, in the circumstances presented here, to allow Smith to benefit from Faulkner's argument concerning the Keene evidence.

43

Bollinger recordings. First, Faulkner contends that the court failed to conduct a cumulative analysis of the newly discovered evidence. Second, Smith and Faulkner claim that the court applied an incorrect standard in its analysis, effectively requiring them to prove Ty Brooks and William Thomas guilty of the Wilford burglary and murder. Third, they argue that the court erroneously assessed the value of the palm print evidence and the Haddaway-Bollinger recordings in conjunction with the evidence that was admitted at their trials. We now consider each of these arguments.[21]

### a. Cumulative Analysis

Faulkner argues that, in analyzing the materiality of multiple pieces of newly discovered evidence, a trial court is required to examine the cumulative impact of such evidence. In this regard, Faulkner cites ineffective assistance of counsel cases and *Brady* cases, and argues that a similar rule should apply to actual innocence petitions brought under CP § 8-301. *See, e.g., Kyles v. Whitley*, 514 U.S. 419 (1995) (cumulative analysis required under *Brady*); *Wilson v. State*, 363 Md. 333, 347 (2001) (same); *Bowers v. State*, 320 Md. 416, 437 (1990) (ineffective assistance of counsel claims). Faulkner further contends that the circuit court failed to engage in a cumulative analysis. The State agrees

---

[21] As discussed above, the Court of Special Appeals concluded in its 2017 opinions that the Ty Brooks palm print evidence and the Haddaway-Bollinger recordings speak to Smith's and Faulkner's innocence, and that Smith and Faulkner could not have discovered such evidence with the exercise of due diligence in time to move for new trials under Rule 4-331. We agree with the Court of Special Appeals' 2017 ruling regarding the palm print evidence and the Haddaway-Bollinger recordings. Thus, we need not delve into the first two prongs of the test for granting a writ of actual innocence with respect to those two items of newly discovered evidence. Instead, we focus solely on whether such evidence, when considered in conjunction with the evidence that was admitted at Smith's and Faulkner's trials, creates a substantial or significant possibility of a different result.

that a cumulative analysis is required, but argues that the trial court conducted a cumulative analysis in Faulkner's case.

We agree that a cumulative materiality analysis is required in actual innocence cases. In this regard, there is no reason to treat actual innocence petitions differently than cases involving claims of *Brady* violations or claims of ineffective assistance of counsel. Indeed, when it enacted CP § 8-301, the General Assembly used language to define the actual innocence materiality standard that is virtually identical to the language that was already understood to require cumulative analyses in the *Brady* and ineffective assistance contexts. *Compare* CP § 8-301(a)(1)(i) ("substantial or significant possibility that the result may have been different") *with Wilson*, 363 Md. at 347, 352 (in a *Brady* case, stating that "[m]ateriality is assessed by considering all of the suppressed evidence collectively" and concluding that, in that case, had the suppressed evidence been disclosed, "there is a substantial possibility that the verdict in Petitioner's case would have been different"); *Bowers*, 320 Md. at 427, 437 (applying the "substantial possibility" standard to an ineffective assistance of counsel case, and reversing the circuit court, which had not conducted a cumulative analysis; "[e]ven when individual errors [of counsel] may not be sufficient to cross the threshold [of ineffective assistance], their cumulative effect may be."). Moreover, in its formulation of the materiality standard for actual innocence cases, the General Assembly explicitly referred to a "substantial or significant possibility that the result may have been different, *as that standard has been judicially determined*." CP § 8-301(a)(1)(i) (emphasis added). This reference to prior judicial constructions of the "substantial or significant possibility" language reinforces our conclusion that the General

Assembly intended courts to make actual innocence materiality determinations in the same way that courts had long made materiality determinations in other post-trial contexts, which require a cumulative analysis of the proffered evidence.

Thus, we hold that, in analyzing the materiality of multiple items of newly discovered evidence for purposes of an actual innocence petition, a circuit court must conduct a cumulative analysis. A cumulative assessment is necessary for two reasons. First, in some cases, no one distinct item of newly discovered evidence will suffice on its own to warrant relief, but cumulatively, such evidence will create a substantial or significant possibility of a different result.[22] Second, even if one or more distinct pieces of newly discovered evidence independently justifies the granting of the writ, a cumulative analysis may affect the court's determination of the appropriate remedy.

Here, we agree with the State that the circuit court conducted a cumulative analysis of the materiality of the palm print evidence and the Haddaway-Bollinger recordings. Although the circuit court's opinion does not contain a separate section that explicitly addresses cumulative effect, it is clear from the overall proceedings on remand that the court considered the newly discovered evidence collectively. The court explicitly stated that it would be considering the cumulative effect of the evidence to determine whether it would lead to the substantial possibility of a different outcome. In addition, the court

---

[22]    In ruling on the merits of an actual innocence petition, a circuit court may decide to begin and end its materiality review with a cumulative analysis of the various pieces of newly discovered evidence before it. However, for purposes of appellate review, we believe it generally is a sound practice for a circuit court first to consider the materiality of each piece of newly discovered evidence independently, and then to conduct a cumulative analysis.

referred to both the Haddaway evidence and the palm print evidence in its discussion of Smith's and Faulkner's "counter-narratives." Although it is preferable for a circuit court to include an explicit discussion of cumulative effect when there are multiple pieces of newly discovered evidence under consideration in an actual innocence petition, an appellate court will review the proceedings in the circuit court for substance, not form. Having conducted that review here, we conclude that the circuit court conducted a cumulative analysis.

### b. *The Standard Applied by the Circuit Court*

Although the circuit court analyzed the newly discovered evidence cumulatively, it did so using an erroneous standard. This error necessitates reversal.

As noted above, in both the Smith and the Faulkner opinions, after summarizing the "counter-narratives" that the circuit court understood Smith and Faulkner to be advancing regarding the guilt of Ty Brooks and William Thomas and comparing those counter-narratives with the narratives that the State presented at the 2001 trials, the court quoted the reasonable doubt instruction the trial judge read to the juries prior to their deliberations. Those instructions included the familiar language describing proof beyond a reasonable doubt as "such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such a belief without reservation in an important matter in your own business or personal affairs." The court then described its ultimate holding as follows:

> The proposition that Mrs. Wilford came into her home with her groceries despite the evident presence of a prowler is so incredible that the Court finds that there is no substantial or significant … possibility that a reasonable juror would have acted on that proposition without reservation in an important matter in his or her own business or personal affairs. Accordingly, there is

no substantial or significant possibility that a jury would have acquitted [Smith and Faulkner].

Smith and Faulkner read this passage as effectively imposing a burden on them to prove beyond a reasonable doubt that Ty Brooks and Thomas committed the Wilford burglary and murder, rather than holding them to their actual burden, which is to show a substantial or significant possibility that their juries would not have found them guilty, had the juries had the benefit of the newly discovered evidence.

As we analyze this contention, we begin by observing that, if the circuit court denied relief because it concluded that Smith and Faulkner would not have been able to convince their juries beyond a reasonable doubt that Ty Brooks and Thomas committed the crimes for which they were charged, that indeed would be error. Under CP § 8-301, the question the court was required to decide was not whether the newly discovered evidence proves Ty Brooks and Thomas guilty beyond a reasonable doubt, but rather whether such evidence, combined with the evidence the juries did hear, creates a substantial or significant possibility that the juries would not have found Smith and Faulkner guilty beyond a reasonable doubt. Those are two separate questions.

The State asserts that Smith and Faulkner take the circuit court's remark about reasonable doubt out of context. On the State's reading of the record, the court never lost sight of the correct inquiry: whether there is a substantial or significant possibility that the juries would not have convicted Smith and Faulkner if the juries had had the benefit of the newly discovered evidence.

48

Although the circuit court ended its discussion quoted above with the statement that "there is no substantial or significant possibility that a jury would have acquitted" Smith and Faulkner, this invocation by the court of the correct standard here and elsewhere in its opinions is not conclusive. *See Mobuary v. State*, 435 Md. 417, 440 (2013) (explaining that the presumption that a trial judge knows the law and applies it correctly "is rebuttable with proof of clear error by the judge, such as misstating or misapplying the law").

Here, we are left with the abiding belief that the circuit court applied an erroneous standard. By considering whether Smith's and Faulkner's "counter-narratives," as envisioned by the circuit court, would result in the conclusion beyond a reasonable doubt that Ty Brooks and Thomas committed the crimes, the court strayed from the correct standard. That is, the court did not account for the possibility that Smith and Faulkner could prevail in their innocence petitions even if the State in a hypothetical trial – or Smith and Faulkner, in their defense cases – would not be able to prove Ty Brooks and Thomas guilty beyond a reasonable doubt. *See Harrington v. Iowa*, 659 N.W.2d 509, 525 (Iowa 2003) ("It was incumbent on the State to prove Harrington's guilt beyond a reasonable doubt; it was not Harrington's responsibility to prove that someone else murdered [the victim]. Therefore, if the withheld evidence would create such a doubt, it is material even if it would not convince the jury beyond a reasonable doubt that [the alternate suspect] was the killer."). This is a fundamental error that requires reversal of the denial of the writs of actual innocence. *See, e.g., Wilson-X*, 403 Md. at 675; *Matter of Dory*, 244 Md. App. at 203.

*c. The Palm Print Evidence*

The circuit court also erred in its materiality analysis regarding the palm print evidence. Although the court acknowledged the undisputed evidence that Ty Brooks is the source of the palm prints on the exterior of the utility room window and on the washing machine inside the utility room, and also recognized that Ty Brooks's statement to Sgt. Metzger claiming that he had never been to Ms. Wilford's home is false, the court deemed the alternate perpetrator evidence brought forward by Smith and Faulkner insufficient to create a substantial or significant possibility of a different outcome in their trials. We are convinced for several reasons that the circuit court abused its discretion in reaching this conclusion.

First, strong alternate perpetrator evidence can be very powerful in the defense of a person accused of a crime where the primary issue in dispute is identity. *See, e.g., Harrington*, 659 N.W.2d at 524-25 (explaining that "Harrington's attorney could have used [the alternate suspect] as the centerpiece of a consistent theme that the State was prosecuting the wrong person," and concluding that this alternate perpetrator evidence might well have led to reasonable doubt in the jury's mind that Harrington was the murderer, despite a purported accomplice's testimony that Harrington had a shotgun and was attempting to steal a car at the dealership where the murder took place). This is especially the case where, as was the case with Faulkner, a defendant presents plausible alibi evidence. *See, e.g., Bowen v. Maynard*, 799 F.2d 593, 612-13 (10th Cir. 1983) ("While it surely was the province of the jury to weigh the credibility of Bowen's alibi, the jury was never given the chance to learn about [the alternative suspect]."); *Ex Parte Miles*, 359

S.W.3d 647, 673 (Tex. Crim. App. 2012) (granting actual innocence relief where, among other factors, petitioner had presented detailed alibi evidence at trial that the jury had rejected).

Second, in this case, the alternate perpetrator evidence is compelling. This is not a case in which a petitioner has come forward with only conjecture or speculation that another person may have committed the crime for which the petitioner was convicted. The newly discovered palm print evidence shows – and the State does not dispute – that Ty Brooks entered Ms. Wilford's home through the window that MSP initially determined was used by the burglar(s) and murderer(s) on January 5, 1987. It also is undisputed that: (1) Ty Brooks had no legitimate right of access to the Wilford home; (2) no prior break-in was reported by Ms. Wilford to police; (3) Ty Brooks has a substantial criminal history, including burglaries in the Easton area in 1986-87; indeed, he admitted to Sgt. Metzger that he "terrorized Easton" during this period of time; (4) Ty Brooks falsely claimed never to have been in Ms. Wilford's home; and (5) Thomas also has a substantial criminal history going back to the 1980s, which includes armed robbery and other crimes in Talbot County. Moreover, we reasonably may assume from Ty Brooks's and Thomas's invocation of their Fifth Amendment right against self-incrimination at the actual innocence hearings that, had they been called as witnesses in the defense cases of Smith's and Faulkner's trials, they similarly would have asserted their privileges against self-incrimination, and that the juries accordingly could have drawn adverse inferences concerning the involvement of Ty Brooks and Thomas in the Wilford burglary and murder. *See Gray v. State*, 368 Md. 529, 558-64 (2002).

We also find significant that, in 1991 and 1992, James Brooks told MSP that Thomas had confessed to burglarizing Ms. Wilford's home with Ty Brooks[23] and to having stabbed her to death with a *butcher knife* – a detail that was not then known to the public. This provides important corroboration of Smith's and Faulkner's theory that Thomas and Ty Brooks are responsible for Ms. Wilford's murder.[24]

Taken together, the Ty Brooks palm print match, Thomas's confession (including James Brooks's written statement that Thomas identified Ty Brooks as his accomplice), and the related evidence concerning Ty Brooks and Thomas create a substantial or significant possibility that juries hearing that evidence would not have found Smith and Faulkner guilty beyond a reasonable doubt.

---

[23] There was controversy during the 2016 and 2018 actual innocence hearings about the admissibility of the reference to Ty Brooks in James Brooks's written statement describing Thomas's confession. Ultimately, in the 2018 hearing, the circuit court seemingly considered James Brooks's written statement in full, i.e., including the identification of Ty Brooks as Thomas's accomplice in the Wilford burglary. We believe the circuit court was correct to do so.

[24] To the extent the State contends that the circuit court was not permitted to consider the 1992 James Brooks written statement implicating Thomas and Ty Brooks because that written statement is not newly discovered, we disagree. *See Kyles*, 514 U.S. at 439 ("[T]he character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record."); *Reilly v. State*, 355 A.2d 324, 331 (Conn. Super. Ct. 1976) ("It is obvious that newly discovered evidence can logically and reasonably lead to other evidence, not necessarily new, which would then take on new dimensions and importance."). Here, the circuit court was correct to consider the effect of the newly discovered evidence on other evidence that was available to Smith and Faulkner at the time of their trials, such as the information contained in James Brooks's 1992 written statement. However, as discussed below, we disagree with the circuit court's analysis of the significance of James Brooks's 1992 statement.

The circuit court reached its different conclusion about the Ty Brooks palm print evidence for two reasons. First, the court concluded that it was impossible Ms. Wilford would have entered the house with her groceries if she had seen a strange car in her driveway. Second, the court found that James Brooks's use of the word "believed" and his reference to Thomas hiding behind the kitchen door in his written statement, as well as his testimony that Ms. Wilford might have been stabbed in the back, undermined the credibility of his accounts. Neither of these conclusions justifies withholding relief from Smith and Faulkner.

In its analysis of the palm print evidence, the circuit court lost sight of the forest for the trees. The points of overriding importance are: (1) Ty Brooks burglarized Ms. Wilford's house in a break-in that was never reported by Ms. Wilford; (2) Thomas's confession that he committed the burglary and murder is corroborated by his statement putting Ty Brooks in the house and identifying the murder weapon as a butcher knife long before those facts were publicly known; and (3) the State's theory was that Smith, Faulkner, and Andrews were the only persons involved in the burglary and murder, and the State has proffered no theory or evidence linking Thomas and Ty Brooks to Smith, Faulkner, and Andrews in 1987.

Viewed against these undisputed points, it strikes us as an abuse of discretion to conclude that it would be *impossible* for Ms. Wilford to have entered her house and put her groceries down with the knowledge that there might be a burglar in the house. Common sense and experience tell us that victims sometimes purposefully interrupt burglaries. Moreover, in 1987, Ms. Wilford did not have a cellphone on her person. Perhaps someone

53

arriving at her home in the 21st century to find a strange car in her driveway would have the presence of mind to call 911 and retreat to safety. A reasonable juror might conclude that, in 1987, in a rural setting, Ms. Wilford decided that the only way to prevent a burglar from taking the valuables in her home would be to scare him into fleeing. Further, a reasonable juror might find it possible that Ms. Wilford assumed that: (1) she could handle a situation involving an intruder in her home; (2) the intruder was probably too busy stealing her valuables to notice her taking down his license plate number; and/or (3) the burglar would not use lethal force against her if there was a confrontation. Indeed, in his written statement to MSP, James Brooks noted that he had heard Ms. Wilford "knew a little self defense" and, therefore, whoever killed her had to have been "real strong" or have surprised her.

With regard to James Brooks's credibility, the important point is that the circuit court believed that portion of James Brooks's account in which Mr. Brooks stated that Thomas confessed responsibility to him for the Wilford burglary and said that he murdered Ms. Wilford with a butcher knife. The court also recognized that Ty Brooks "was clearly at Mrs. Wilford's home." In light of the circuit court's crediting these central facts, the court's points of criticism of James Brooks's written statement and testimony are insignificant.

With respect to the 1992 written statement, the circuit court took issue with James Brooks's use of the word "believed," concluding that Mr. Brooks at that point was providing his own assumptions about how the murder occurred. The court also referred to the forensic evidence showing that Ms. Wilford struggled with her attacker as undermining

54

the credibility of James Brooks's account that Thomas told him he hid behind the kitchen door.

We think it is much more likely that James Brooks's use of "believed" indicated that he believed, but was not certain, that Thomas told him a year or two earlier that he had hid behind the kitchen door. But even if James Brooks's reference to Thomas hiding behind the kitchen door merely was James Brooks's own assumption about where Thomas placed himself before attacking Ms. Wilford, that supposition does not undermine the key point that the circuit court credited: Thomas confessed to attacking and murdering Ms. Wilford with a butcher knife.

In addition, the forensic evidence showing that Ms. Wilford struggled with her attacker is not necessarily inconsistent with Thomas having hid behind the kitchen door. Common sense again tells us that it is possible for a burglar to surprise a victim and for a struggle nevertheless to ensue. But, again, even if James Brooks got that detail wrong in his written statement more than a year after Thomas confessed to him, that does not change the fact that Thomas confessed to Mr. Brooks, and that Thomas's confession, according to James Brooks, also put Ty Brooks in Ms. Wilford's house.

The court also found James Brooks's testimony at the 2016 hearing lacked credibility because, when asked if he could recall if Thomas said where he had stabbed Ms. Wilford, James Brooks testified, "it might have been in the back." Again, the court turned to the forensic evidence, which showed that Ms. Wilford was not stabbed in the back. Notably, James Brooks did not recount in his written statement in 1992 that Thomas told him he had stabbed Ms. Wilford in the back. James Brooks testified at the 2016 hearing

55

that his memory of Thomas's confession had faded in the more than 25 years that had passed. Thus, James Brooks's equivocal statement in 2016 that Thomas "might have" told him he stabbed Ms. Wilford in the back is not surprising. If James Brooks had included a detail in his much earlier written statement that was demonstrably false – for example, if Mr. Brooks had said in his written statement that Thomas told him Ms. Wilford was in the house asleep when he and Ty Brooks broke in – then there might be more reason to believe that Thomas falsely claimed responsibility for the crimes, or that James Brooks fabricated the confession in the hope that he would earn at least part of the $25,000 reward. But there is nothing in James Brooks's 1992 written statement that contradicts any known fact about the burglary and murder. To the contrary, the written statement includes a fact the public did not know at the time: the killer used a butcher knife. And it includes a fact that MSP did not know at the time: Ty Brooks burglarized Ms. Wilford's home.

The circuit court and the State correctly observe that there was a substantial amount of evidence (albeit no physical evidence) introduced against Smith and Faulkner in their trials. Both Haddaway and Andrews testified to seeing blood on Smith and/or Faulkner. In Faulkner's trial, Fitzhugh also testified to having been with Haddaway when she came upon Smith, Faulkner, and Andrews on Black Dog Alley, and she claimed to have seen blood on all three young men. In addition, both juries heard Smith's incriminating statements to Haddaway. In Smith's trial, Bollinger testified that Smith confessed involvement in the crimes during questioning on April 25, 2000, and that Smith provided specific details about Ms. Wilford's appearance at the time of the murder, including the color of the coat she was wearing and the fact that she had glasses on a chain around her

56

neck. While he did not admit to providing those details to Bollinger, Smith acknowledged in his trial testimony that he had confessed his and Faulkner's involvement to Bollinger. Different jailhouse informants also testified in each trial that Smith and Faulkner confessed to them. The State also points out that the juries were aware that the palm prints outside and inside the utility room did not match Smith, Faulkner, or Andrews, but convicted Smith and Faulkner nonetheless.

However, the absence of any physical evidence linking Smith and Faulkner to the crimes was significantly less powerful in their trials than it would have been had their juries *also* heard that the palm prints belonged to serial burglar Ty Brooks, and that, in 1991-92 James Brooks told police that Thomas had confessed to killing Ms. Wilford during a burglary of her home that he committed with Ty Brooks. In our view, notwithstanding the evidence that was presented at the trials, the newly discovered palm print evidence, combined with Thomas's confession to James Brooks and the related evidence about Ty Brooks and Thomas, creates a substantial or significant possibility that the juries would have reached different results if they had received this alternate perpetrator evidence.

### d. The Haddaway-Bollinger Recordings

Even if we were not convinced that the alternate perpetrator evidence by itself warrants relief, that is not the only newly discovered evidence that Smith's and Faulkner's juries would have considered. The Haddaway-Bollinger recordings also add meaningfully to the analysis.

The State recognizes that the prosecution improperly suppressed the agreement between the State and Haddaway to dismiss drug charges against Haddaway's grandson

57

prior to her testimony against Smith and Faulkner. However, the State argues that the circuit court properly concluded that the secret agreement to dismiss the charges was not material, i.e., that it does not undermine confidence in the verdicts. For several reasons, the Haddaway-Bollinger recordings, while arguably insufficient by themselves to create a substantial or significant possibility of a different outcome of Smith's and Faulkner's trials, nevertheless confirm that relief is warranted here.

First, although Haddaway was not the only witness whose testimony was important to the State's case, she was a key witness. To be sure, Haddaway was cross-examined at both trials about the reward money that she had already partially received, and the additional money that she might receive if Smith and Faulkner were convicted. However, the impeachment that Haddaway would have undergone based on disclosure of the recorded conversations cannot be described as merely cumulative of the impeachment that occurred at the trials. For one thing, the fact that Bollinger felt it necessary to record his conversations with Haddaway, as the trials of the three Wilford murder defendants neared, would have said a great deal about how the State viewed this important witness.

More importantly, Haddaway's professed willingness to alter her testimony based on whether the State would dismiss the drug charges against her grandson likely would have markedly increased the effectiveness of her impeachment by defense counsel. A jury that heard Haddaway on those recordings might well conclude that an oath to tell the truth was meaningless to Haddaway. Being able to show Haddaway in that light likely would have changed a great deal about how the trials proceeded. For example, in the trials that occurred, Smith and Faulkner were able to make little use of Haddaway's purported change

58

in recollection that Fitzhugh, not Thomas Marshall, was her passenger on the day of the murder. Had defense counsel been able to depict Haddaway as being willing to say anything she thought would achieve her aims at any particular moment, both juries may well have been more skeptical of Haddaway's more recent recollection that her passenger was Fitzhugh, her former employee. For Faulkner's jury, this also may well have had a ripple effect, leading the jury to be more skeptical about Fitzhugh's claim to have been with Haddaway on the day of the murder, especially given the discrepancies between her testimony and Haddaway's.[25]

In addition, with knowledge of Haddaway's machinations, Faulkner's jury may well have placed more weight on the discrepancies in Haddaway's testimony in the two trials. Notably, Haddaway testified at Smith's trial only that she saw blood on Smith's shirt, but at Faulkner's trial she claimed that she saw blood on Smith's shirt *and* on Faulkner's pants from his kneecaps "down over his white tennis shoes and all over his tennis shoes," as well as blood smeared on the side of Faulkner's face. Although Haddaway did not say anything at Smith's trial about seeing Faulkner wearing gloves, but rather testified that the sleeves of the coat Faulkner was wearing covered his hands, she told Faulkner's jury that she saw

---

[25] Among other differences, Fitzhugh testified that she saw blood on Andrews's pants, whereas Haddaway did not say anything about seeing blood on Andrews, and the State's theory was that Andrews waited across a field while Smith and Faulkner broke into the house and eventually murdered Ms. Wilford. In addition, according to Fitzhugh, Smith said they were heading back into town to get "Donald" to come back and get a deer they had just killed. Haddaway claimed that Smith said he had stabbed a dog. Further, Fitzhugh did not recall noticing anything unusual after she and Haddaway concluded their encounter with the three young men. Haddaway, on the other hand, claimed that she heard sirens and saw police cars and an ambulance turn onto Kingston Road.

Faulkner wearing a pair of black gloves on Black Dog Alley. In addition, Haddaway said for the first time at Faulkner's trial that she saw Smith, Faulkner, and Andrews again that evening at her mother's house, where the three young men were arguing and fighting with each other and Faulkner told the other two that they would not receive any money. She also claimed to have seen money and a piece of jewelry on the dining room table in her mother's house that night. Had Faulkner's jury heard about Haddaway's willingness to change her testimony to further her interests, they may well have questioned why Haddaway omitted these important details from her testimony at Smith's trial. In short, had the juries heard the Haddaway-Bollinger recordings, they likely would have seen Haddaway in a very different light. *See Wilson,* 363 Md. at 353 (explaining that, "while Petitioner's trial counsel attempted to cross-examine [the alleged coconspirators] on the issue of their credibility, that attempt was far less effective than it would have been had he possessed the [suppressed impeachment material]"; *Conyers v. State*, 367 Md. 571, 614 (2002) (rejecting the State's argument that impeachment of Johnson, a key witness, was cumulative; notwithstanding "vigorous efforts by Petitioner's lawyers to portray Johnson as a jailhouse snitch out to get a deal," the Court could not say that "if the jury was informed of the totality of the circumstances leading up to Johnson's ultimate plea agreement, there would not be a substantial possibility that the outcome would have been different").

Second, the circuit court did not consider that the Haddaway-Bollinger recordings reveal several important irregularities in the State's handling of the cases against Smith, Faulkner, and Andrews that could have called the integrity of the prosecution into question. In particular, the juries likely would have found it very troubling that, after initially

60

rejecting Haddaway's request to dismiss the charges against her grandson, the State's Attorney's Office reacted to Haddaway's threat to destroy the State's case by capitulating to Haddaway. And not only that: the State refused to put its agreement to dismiss the charges in writing because the State wanted to "protect" its interests with respect to the murder trials in which Haddaway would be a key witness starting a few days later. In other words, the State did not want Smith and Faulkner to know that the State had acceded to Haddaway's request, presumably because the State did not want to subject Haddaway (and Bollinger, McCauley, and possibly other MSP witnesses) to cross-examination on this point.

In addition, the recordings show that the State provided extraordinary access to Haddaway to materials in its files (including a description of Ms. Wilford's missing ring), and was aware and approved of Eckel providing Haddaway with still more discovery materials that he received as Andrews's attorney. The jury likely would have been troubled by these actions and by the State's condoning of Eckel's apparent conflict of interest.

Third, Bollinger himself was an important witness against Smith. It was Bollinger to whom Smith confessed his participation in the Wilford burglary and murder with Faulkner during his interrogation at MSP. Bollinger's interview of Smith was not recorded. Bollinger told Smith's jury that, during his questioning of Smith, Smith recalled very precise details of Ms. Wilford's appearance on the day of the murder, 13 years earlier, including that she was "wearing a blue coat, had black hair, [and] had glasses on, on a chain around her neck." Although Smith acknowledged that he confessed involvement in the crime to Bollinger, he did not admit that he provided any details of Ms. Wilford's

61

appearance to Bollinger. Thus, Bollinger's account of Smith's confession was affirmatively important to the State's case against Smith,[26] as well as important in rebutting Smith's claim that Bollinger coerced him to confess by threatening to deny Smith access to his family forever. Bollinger denied having threatened Smith in any way. Thus, there was a credibility contest between Smith and Bollinger at Smith's trial when Smith recanted his confession to Bollinger. Had Smith's counsel known of Bollinger's participation in the discussions with Haddaway concerning the dismissal of Janda's drug charges and Bollinger's knowledge of and involvement in the other irregularities discussed above, his cross-examination of Bollinger likely would have been very different and more effective.

Finally, Haddaway brought up with Bollinger an effort to "go to the jail and scrape the bottom of the bucket to find out if they can get somebody that's got six months' time a way out to see if he'll lie for 'em. And then they gotta go up to jail and try to get a federal prisoner or a [sic] undercover cop to try to lie for them, who's not interested in it." Given that jailhouse informants ended up testifying in both trials, Haddaway's reference to "scrap[ing] the bottom of the bucket" in search of a jailhouse informant "to see if he'll lie" would have been important to Smith's and Faulkner's defenses.[27]

---

[26]     Indeed, in her closing argument, Assistant State's Attorney Hill highlighted that part of Bollinger's testimony: "And to the police [Smith] says I saw the woman…. And she was wearing a blue coat and she had glasses on a cord. That is a piece of detail I submit you only know if you're there and Jonathan Smith was there."

[27]     In addition, as discussed above, although he did not have the Haddaway-Bollinger recording that discussed an effort to "scrape the bottom of the bucket" in search of a jailhouse informant, Faulkner's counsel nevertheless told the trial judge in a sidebar that he wanted to question Haddaway about her visit to Andrews with Eckel, in part, to ask about an attempt to recruit a bank robber as a jailhouse informant. The trial judge sustained

*e. The Cumulative Effect of the Newly Discovered Evidence
Warrants New Trials for Smith and Faulkner.*

For the reasons stated above, we conclude that the Ty Brooks palm print match and related evidence warrant the granting of Smith's and Faulkner's actual innocence petitions. Even if we assume for the sake of argument that the alternate perpetrator evidence independently does not require the issuance of the writs of actual innocence, the Haddaway-Bollinger recordings and the alternate perpetrator evidence cumulatively entitle Smith and Faulkner to relief. The question thus becomes, what is the appropriate remedy? Smith and Faulkner both request that this Court order their convictions vacated or, in the alternative, that we remand their cases to the circuit court for new trials.

We conclude that new trials are warranted for both Smith and Faulkner.[28] Although we are persuaded that there is a substantial or significant possibility that, if the juries had heard the newly discovered evidence along with the evidence that actually was presented (including the lack of any physical evidence linking Smith and Faulkner to the crime), they would have reached a different result, we do not exonerate Smith and Faulkner. It remains the case that Smith and Andrews confessed involvement in the events of January 5, 1987, at various times. Andrews's relatively consistent account of the events of that day – an account that, according to MSP, he gave to police in his first interrogation on the afternoon

---

the State's objection to this line of cross-examination. If Faulkner's counsel had been able to play the pertinent part of the Haddaway-Bollinger recorded conversation, perhaps the trial judge would have permitted inquiry on this point.

[28]     The granting of new trials does not preclude the circuit court on remand from considering the reopened post-conviction proceedings prior to any new trial, should the State elect to retry Smith and Faulkner.

of April 25, 2000 – is difficult to reconcile with Smith's and Faulkner's claims of innocence. If the State elects to retry Smith and Faulkner, it will be up to new juries to consider the conflicting evidence and theories and determine if the State has proven Smith and Faulkner guilty beyond a reasonable doubt.

## IV

## Conclusion

We do not order the granting of these writs of actual innocence lightly. Nor do we predict the outcome of Smith's and Faulkner's new trials, should the State elect to retry them. Nevertheless, we are convinced that new trials are warranted in light of the newly discovered evidence discussed in this Opinion. Thus, for the reasons stated above, we reverse the judgment of the Court of Special Appeals and order that both cases be remanded to the Circuit Court for Talbot County with the instructions to grant Smith's and Faulkner's petitions for a writ of actual innocence and to order new trials for both Smith and Faulkner.

**IN NO. 42, JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY AND TO REMAND THE CASE TO THAT COURT TO GRANT THE PETITION FOR A WRIT OF ACTUAL INNOCENCE AND TO CONDUCT FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY TALBOT COUNTY.**

**IN NO. 43, JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY AND TO REMAND THE CASE TO THAT COURT TO GRANT THE**

**PETITION FOR A WRIT OF ACTUAL INNOCENCE AND TO CONDUCT FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY TALBOT COUNTY.**